IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 7, 2026

**STATE OF TENNESSEE v. LERICO SULLIVAN**

**Appeal from the Criminal Court for Shelby County**
**No. C1503358        Chris Craft, Judge**
_____

**No. W2025-00708-CCA-R3-CD**[1]
_____

Defendant, Lerico Sullivan, challenges the revocation of his probation, arguing that because the only evidence supporting the revocation was improperly admitted testimonial hearsay, this court should reverse and dismiss the revocation proceeding. Defendant also challenges the trial court's holding him in contempt twenty times during the hearing and ordering the ten-day sentences imposed for each contempt finding to be served consecutively. The State concedes that the trial court erred by admitting testimonial hearsay but asks this court to remand the case for a new revocation hearing. The State contends that the trial court did not err by holding Defendant in contempt or by aligning the sentences consecutively. Because the trial court erred by admitting testimonial hearsay without making the appropriate findings and because no other evidence supported the allegations that Defendant violated his probation, we reverse the revocation of his probation and dismiss the case. Regarding the twenty findings of contempt and related consecutive sentencing decision, we conclude that the evidence preponderates against three of the findings of contempt and reverse and dismiss those findings. We also conclude that the effective sentence on the contempt convictions should be modified to sixty days to be served in confinement. Accordingly, the judgment of the trial court is affirmed as modified in part and reversed and dismissed in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified in Part; Reversed and Dismissed in Part**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

_____

[1] This Court consolidated the appeals of the revocation of Defendant's probation, which was originally assigned case number W2025-00708-CCA-R3-CD, and the contempt citations that arose from the revocation proceeding, which was originally assigned case number W2025-00715-CCA-R3-CD.

1

Tony N. Brayton and Harry Eugene Sayle, III, Assistant District Public Defender (on appeal); and Lerico Sullivan, pro se (at hearing), for the appellant, Lerico Sullivan.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Brandon Wright, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the revocation of the term of probation imposed for Defendant's 2015 convictions and the findings of contempt made by the trial court during the revocation hearing.

## Factual and Procedural Background

On October 26, 2015, Defendant pleaded guilty to aggravated burglary, a Class C felony; theft of property valued at $10,000 or more but less than $60,000, a Class C felony; and possession of burglary tools, a Class A misdemeanor, in exchange for a total effective sentence of six years to be served on probation. On January 27, 2017, probation officer Debra Irvine filed an affidavit alleging that Defendant violated his "judicial diversion probation," specifically citing Tennessee Code Annotated section 40-35-313. Furthermore, Defendant stated at the revocation hearing that he had been placed on judicial diversion. The original judgments do not appear in the record on appeal, but the guilty plea submission transcript, which is included in the record, contains no indication that Defendant was placed on judicial diversion.[2] As grounds for revocation, Ms. Irvine alleged that Defendant was cited on August 23, 2016, for driving while his license was suspended, revoked, or canceled; that Defendant had failed to report since November 25, 2015; that Defendant owed $2,361.25 in supervision fees; that Defendant had failed to provide proof of employment; and that Defendant had failed to provide proof that he was making

---

[2] The State cites Defendant's pleading guilty in exchange for a Range II sentence as evidence that he was not granted judicial diversion, *see* Tenn. Code Ann. §§ 40-35-106 (defining a Range II offender as someone who has at least two but no more than four prior felony convictions "within the conviction class, a higher class," or the next two lower classes" or at least one prior felony conviction if the "conviction offense is a Class A or B felony"); 40-35-313(a)(1)(B)(i)(*d*) (stating that persons previously convicted "of a felony or a Class A misdemeanor for which a sentence of confinement is served"), but the record does not definitively indicate that Defendant pleaded guilty as a Range II offender. Further, as the State notes, Defendant could have accepted an out of Range sentence as part of his plea agreement. Moreover, a six-year sentence falls within both Range I and Range II for Class C felony convictions. *Compare* Tenn. Code Ann. § 40-35-112(a)(3) *with id.* §40-35-112(b)(3). Notably, successful completion of judicial diversion would entitle Defendant to discharge and dismissal of the proceedings and expunction of all official records related to the proceeding. *See id.* § 40-35-313(a)-(b). The absence of the original judgment documents renders determination of this question impossible, and, in any event, such determination is not necessary to determine the outcome of the issues presented in this appeal. We simply note the discrepancy.

2

restitution payments. The affidavit listed probation officer Scherrie Lundy as the proper point of contact rather than the affiant, Ms. Irvine.

The trial court issued a revocation warrant that same day. Notably, the arrest warrant forwarded to the Shelby County Sheriff for execution contained a different Social Security number and address for Defendant than that listed in the affidavit in support of the revocation warrant, and both the affidavit and warrant contained an incorrect date of birth for Defendant. The warrant was not served on Defendant until he was arrested on March 9, 2025. The trial court held a hearing on the revocation warrant on April 14, 2025, and Defendant elected to represent himself.[3]

At the revocation hearing, the trial court allowed Defendant to read aloud several motions he had prepared to "make a record" and ordered that the motions be filed, but no motions were included in the record on appeal. From the transcript of the hearing, it appears that some of Defendant's motions were inapplicable to the proceeding, but Defendant did move to "quash" the revocation proceeding on grounds that the warrant was not served until more than three years after his term of probation expired and that the warrant contained erroneous identifying information that rendered it invalid. Defendant also argued that the delay in execution of the warrant deprived him of due process.

The trial court ruled that the warrant was valid when initially issued, and Defendant interrupted the ruling three times to "object." The trial court explained that the court was not the prosecutor and was making a ruling to which Defendant could not object. When Defendant interrupted four more times, the trial court warned him that the court would "start giving" Defendant "ten days for every word you say unless you let me rule." The court then ruled that the delay of more than eight years between issuance and service was "of no consequence at all." Defendant objected, and the trial court sentenced him to "ten extra days in prison because you're continuing to talk during my ruling."

When the trial court began to read the allegations contained in the violation affidavit, Defendant interrupted, saying that "the restitution and those fines had already been discharged," and the court responded, "No, sir. I had not discharged them." Defendant insisted that they had "already been discharged" because he had sent them to "the District Clerk." The court told Defendant that he would be able to present evidence of the discharge during the hearing and tried to explain the process, but Defendant interrupted, and the trial court again warned him that if he continued to interrupt the court, he would "get

---

[3] The record does not contain a transcript of the hearing at which the trial court concluded that Defendant would be permitted to proceed pro se or a written waiver of the right to counsel. *See* Tenn. Code Ann. § 40-35-311(b) (stating that the defendant "is entitled to be represented by counsel and has the right to introduce testimony in the defendant's behalf" at the revocation proceeding); Tenn. R. Crim. P. 44(b)(1) (requiring written waiver); *State v. Herrod*, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (explaining proper inquiry to deter whether the defendant has made "a competent and intelligent waiver" of right to counsel (citation omitted)).

consecutive jail time." Defendant interrupted again, and the trial court responded, "That's another ten days." Defendant began arguing that the trial court had "no jurisdiction," and the ensuing exchange resulted in the court's finding him in contempt two more times, saying, "That's 30 days . . . consecutive to any time he does on this violation of probation if it's violated." After more back and forth, the court warned Defendant, "Do not say another word unless I ask you a question. And if you do it's ten days per word consecutive to a six-year sentence."

At that point, both parties waived opening statements, and the State called Tennessee Department of Correction employee Sherderricka Clay, who testified that she was "a court specialist" who functioned as "keeper of the record" and "a liaison between probation and the Court." Ms. Clay testified from records that she brought with her that Defendant violated the terms of his probation by failing to report, failing to pay $2,361.25 in supervision fees, and failing to provide proof that he had obtained full-time employment or had made timely restitution payments. She said that her file included a note from Defendant's probation officer that the officer had attempted to contact him by phone and by home visit in September 2016 but did not get any response.

On cross-examination, Ms. Clay testified that Ms. Lundy, who was listed as the contact on the violation affidavit, was no longer employed as a probation officer.[4] At that point, Defendant asked the trial court to dismiss the violation proceeding on grounds that Ms. Lundy's absence deprived him of the right to confrontation under the Sixth Amendment. The trial court overruled Defendant, stating that "it's not necessary that she be here." Defendant again argued that her absence deprived him of the right to confront his accuser, and the trial court told Defendant that the prosecutor was his accuser. Defendant argued that the prosecutor could not be a witness and, accordingly, was not his accuser. At that point, the court told Defendant to "[s]top talking." When Defendant continued to press the point, the trial court held him in contempt four more times. The court reiterated that it would not dismiss the charges on the grounds the probation officer was not present. When Defendant continued to interrupt the court to explain his position in increasingly more vehement terms, the court found him in contempt seven more times. The court told Defendant, "[Y]ou need to understand that . . . it's not hearsay because the government records exception applies. You don't understand the rules of evidence." Defendant stated that he did understand the rules of evidence and his "constitutional rights," and the trial court responded by finding Defendant in contempt two more times, making his total "160 days of contempt."

Defendant then continued to cross-examine Ms. Clay, asking if she knew him personally, and she said that she did not. He then asked whether she knew "personally" whether the information she had testified to was "actual facts," and she replied, "They're documented in our system." Defendant attempted to clarify whether Ms. Clay had any

---

[4] There was no mention of Ms. Irvine, the person who signed the violation affidavit.

4

personal knowledge of the allegations contained in the affidavit, but the State objected, arguing that Defendant was "asking the witness to speculate onto what someone else knew or did." Defendant then objected to the State's objection. At that point, the trial court chastised Defendant:

> Sir, you can't object to someone's objection. Now you can respond to the objection, but you can't object to his objection. That's silly. Children know not to do that. So you need to understand you know nothing about the law or the rules of evidence. So he objected because he said that you're asking her what somebody else personally knew and that's Rule of Evidence 602. So what is your response?

Defendant responded that he could ask Ms. Clay if "she personally knows anything about this affidavit." The court propounded the question to Ms. Clay, who said, "It's from the record." The trial court said, "Which is proper under the rule of hearsay."

Ms. Clay testified that she was sure of the veracity of the allegations, saying, "Well, anything that's documented in our system, we take as fact. Like, if I document something that happened, any officer that goes in, they can read that and that's what happened. . . . It's factual." When Defendant asked whether it was possible that the information in the affidavit was false, Ms. Clay said, "I take it as fact." The court then ordered Defendant to move on or lose the opportunity for further cross-examination.

Defendant asked Ms. Clay whether she had personal knowledge of whether the social security number included in the violation affidavit was correct, and she admitted that she had "checked the records in our system and the social security number is not correct." Ms. Clay also admitted that the date of birth listed for Defendant on the violation affidavit was incorrect. When Defendant noted these discrepancies, Ms. Clay insisted, "Everything is true except for the information that I came across."

The State then called Shelby County Sheriff's Department fingerprint technician Katherine Jeffries, who testified that every time she receives a fingerprint card, she either assigns it a Record and Identification ("RNI") number or determines whether the fingerprints belong with an already existing RNI number, noting that "for every individual there's only one RNI number." She added, "As far as our department is concerned, an RNI number is that person." Ms. Jeffries said that, at the request of the State, she had compared the fingerprints associated with "Lerico Sullivan, RNI No. 354798" with fingerprints taken from Defendant in the courtroom and determined that they were a match. Defendant objected, arguing, "Fingerprints do not give validity to any sworn affidavit." The trial court overruled the objection on grounds that Ms. Jeffries had simply compared the fingerprint card Defendant completed on the day of the hearing with the one associated with his original convictions and determined that they matched.

5

During cross-examination, Ms. Jeffries admitted that she did not personally know Defendant.

Following Ms. Jeffries' testimony, the State rested, and Defendant chose not to present any proof.

The State began its closing argument by pointing out that Defendant "was not present" and asserting that he had been arrested in Texas on "felony matters." Defendant objected and stated that he did not have any pending charges. The trial court told Defendant to stop, and when Defendant continued to argue, the trial court found him in contempt a seventeenth time for "a total of 170 consecutive days, day for day in prison consecutive to any time you get on this if your probation is violated." The court then explained that Defendant would be given an opportunity to argue after the prosecutor finished, and Defendant interrupted with, "And I'm asking --." During the ensuing exchange between the trial court, the prosecutor, and Defendant, the court found Defendant in contempt two more times. The State argued that, based on Ms. Clay's testimony, Defendant had violated the terms of his probation and that Defendant had failed to prove that he had complied with the terms of his probation, stating, "There's been no proof of a job, no proof of education, no proof that he even cared about this probation."

During his closing argument, Defendant again asked the court to dismiss the proceeding based on the inclusion of the "wrong identifying information on the affidavit." Defendant also argued that the trial court had "violated multiple . . . constitutional guarantees of due process."

At the conclusion of the argument, the trial court found that the warrant was valid "even though the social security number was incorrect and the date of birth was incorrect." The court noted that no proof was presented to show that Defendant had paid restitution or reported during his probationary period. The court stated that there had been no proof that Defendant had "done anything that he was supposed to do." Defendant objected, but the trial court ruled that Defendant had violated his probation and ordered that he serve the balance of his six-year sentence in confinement. Defendant objected again, and during the ensuing exchange, the trial court found Defendant in contempt a twentieth time, for a total of "200 days consecutive to the six years."

## Analysis

On appeal, Defendant challenges the revocation of his probation as well as the trial court's findings of contempt and the resulting 200-day sentence.

### I. Probation Revocation

Defendant first asserts that the trial court erred by admitting testimonial hearsay statements in violation of his constitutional right to confront the witnesses against him and

6

that, because the inadmissible hearsay was the only evidence presented to support the violations, this court should reverse the revocation and dismiss the revocation proceeding. The State concedes that the trial court erred by admitting testimonial hearsay without making the proper findings but asserts that a remand for a new revocation proceeding is appropriate.

### A. Confrontation Clause in Revocation Proceedings

"One of the bedrock constitutional protections afforded to criminal defendants is the Confrontation Clause of the Sixth Amendment, which states: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Hemphill v. New York*, 595 U.S. 140, 150 (2022) (quoting U.S. Const. amend. VI); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008) ("The fundamental right of confrontation applies through the Fourteenth Amendment to the states."). Similarly, article I, section 9 of the Tennessee Constitution guarantees the right to confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face." Tenn. Const. art. I, § 9; *see State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) ("expressly" adopting and applying to article I, section 9 "the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." (citations omitted)). The Confrontation Clause "protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." *Smith v. Arizona*, 602 U.S. 779, 784 (2024); *see State v. Green*, No. W2024-00370-CCA-R3-CD, 2025 WL 2027873, at *6 (Tenn. Crim. App. July 21, 2025). "The Clause's prohibition 'applies only to testimonial hearsay.'" *Smith*, 602 U.S. at 784 (quoting *Davis v. Washington*, 547 U.S. 813, 823 (2006)).

Because a probationer holds only a limited liberty interest, however, he is not entitled to "'the full panoply of rights due a defendant' in criminal prosecutions," including the right to confrontation as it is embodied in the Sixth Amendment. *State v. Wade*, 863 S.W.2d 406, 408 (Tenn. 1993) (quoting *Black v. Romano*, 471 U.S. 606, 613 (1985)). Yet "the minimum requirements of due process in probation proceedings" include "a conditional right to confront and cross-examine adverse witnesses." *Id.* (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). Under this conditional right, hearsay evidence may be admitted at a probation hearing if "the hearing officer specifically finds good cause for not allowing confrontation" and that the offered evidence is reliable. *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *Wade*, 863 S.W.3d at 408, 410 (hearsay inadmissible at revocation hearing "without a finding of good cause and proof of . . . reliability"). Accordingly, the trial judge must first explain "why confrontation is not desirable or impractical" and then determine "whether the hearsay evidence sought to be admitted bears substantial indicia of reliability." *State v. Dotson*, No. M2023-00430-CCA-R3-CD, 2024 WL 3027295, at *6 (Tenn. Crim. App. June 17, 2024), *perm. app. denied* (Tenn. Nov. 14, 2024) (quoting *Moss v. Tenn. Bd. of Paroles*, No. M2000-00128-COA-R3-CV, 2000 WL 1425278, at *2 (Tenn. Ct. App. Sept. 28, 2000)).

"Good cause is not a precise standard, and there is no bright-line rule for determining whether good cause exists." *Id.* (citing *Miller v. Tenn. Bd. of Paroles*, No. 01A01-9806-CH-00293, 1999 WL 43263, at *5 (Tenn. Ct. App. Feb. 1, 1999)). "The inquiry is factually driven and may, in large measure, depend on the nature and purpose of the evidence sought to be introduced," and evidence "establishing the grounds for revoking [probation] should be treated more rigorously because it provides the basis for depriving the [probationer] of his or her liberty." *Miller*, 1999 WL 43263, at *5. Illustrative examples of "good cause" include "threats or a finding the witness would be 'exposed to significant risk of harm,'" *Livingston v. State of Tennessee Bd. of Paroles*, No. M1999-01138-COA-R3-CV, 2001 WL 747643, at *12 (Tenn. Ct. App. July 5, 2001), "fear of retaliation," *Clifton v. Easterling*, No. 1:11-cv-01347-JDB-egb, 2016 WL 918049, at *6 (W.D. Tenn. Mar. 8, 2016), inability to locate the declarant despite diligent effort, *see Dotson*, 2024 WL 3027295, at *6, and excessive cost associated with securing a witness's attendance, *see State v. Jones*, No. M2013-00924-CCA-R3-CD, 2013 WL 5628772, at *3 (Tenn. Crim. App. Oct. 14, 2013). Importantly, because probation revocation proceedings "involve a search for the truth," when a court is "presented with hearsay evidence to prove" that the defendant violated the terms of his probation," it must satisfy itself "that the evidence is, by its very nature, inherently reliable and the type of information commonly relied upon by reasonably prudent persons or that the evidence sought to be introduced has already been subjected to the same sort of adversarial questioning as live, in-person testimony." *Miller*, 1999 WL 43263, at *5 (citations omitted).

### B. The Evidence Presented at the Hearing

As the State concedes, Ms. Clay's testimony regarding the contents of Defendant's probation supervision record qualified as testimonial hearsay because "[t]he focus" of each of the documents to which Ms. Clay testified, including information regarding Defendant's convictions, the rules of his probation, and the violation affidavit, were on their potential use in court. *Green*, 2025 WL 2027873, at *8. Consequently, the information in "the document[s] [contained] targeted accusation[s] against the Defendant," and the affidavit, at least, "was sufficiently formal in character." *Id.* (first citing *Smith*, 602 U.S. at 802; and then *Dotson*, 450 S.W.3d at 69). Moreover, the statements were clearly offered to prove the truth of the matters asserted because they could have only supported revocation of Defendant's probation if they were true. *See id.* at 9 (citing *Smith*, 602 U.S. at 803); *see also* Tenn. R. Evid. 801(c).

### 1. Good Cause

Further, as the State again concedes, the admission of this evidence violated the conditional confrontation right afforded in probation revocation hearings because the trial court failed to make a finding that there was good cause to excuse Ms. Lundy's absence or that the information provided by Ms. Lundy via Ms. Clay was reliable. Indeed, "[t]he trial court not only failed to make a specific good cause finding, but it also failed to acknowledge the good cause requirement." *State v. Rice*, No. M2024-01219-CCA-R3-CD,

2025 WL 2049030, at *7 (Tenn. Crim. App. July 22, 2025). Instead, the trial court overruled Defendant's objection, telling Defendant, incorrectly, that the prosecutor, and not Ms. Lundy, was his "accuser" and ruling, also incorrectly, Ms. Clay's *testimony* was admissible via the official records exception to the rule against hearsay. *See* Tenn. R. Evid. 803(8). That exception applies to *records* and not to testimony about records. *See Jeffries v. State*, 640 S.W.2d 854, 857 (Tenn. Crim. App. 1979) (stating that witness's "testimony as to what she read on the computer was hearsay and was objectionable"); *see also State v. Day-Knowles*, No. M2023-00644-CCA-R3-CD, 2024 WL 2698892, at *10 (Tenn. Crim. App. May 24, 2024) (stating that witness's testimony about what she read in the report was not admissible under the public records exception); *Dep't of Children's Servs. v. B.F.*, No. E2004-00338-COA-R3-PT, 2004 WL 2752808, at *5 (Tenn. Ct. App. Oct. 2, 2004) (stating that testimony offered by "case manager [who] was not assigned the child's case until after the petition to terminate parental rights was filed" and who had no "personal knowledge of what transpired in the case before the petition was filed" was not admissible via business records exception and was instead "inadmissible hearsay"). That is because testimony about a particular record does not bear the same indicia of reliability as the record itself. *See B.F.*, 2004 WL 2752808, at *3 (stating that testimony does not "exhibit[] the 'high degree of accuracy' attributed to a regularly kept record"). Because the State did not attempt to introduce Defendant's probation supervision records, the rule is inapplicable. Moreover, the record does not contain any evidence to support a good cause finding given that the only reason stated for Ms. Lundy's absence was the fact that she no longer worked as a probation officer. The record reveals no evidence that the State had attempted to secure Ms. Lundy's attendance at the hearing. *See, e.g.*, *see Dotson*, 2024 WL 3027295, at *6.

## 2. Reliability

Additionally, the trial court failed to make a finding that the information offered by Ms. Clay was reliable. Although Ms. Clay testified that she considered the information contained in the probation records "factual," the information did not bear any inherent reliability and had not been subjected to any adversarial testing. *See Miller*, 1999 WL 43263, at *5-6 (stating that hearsay evidence offered to prove a violation must be "by its very nature, inherently reliable and the type of information commonly relied upon by reasonably prudent persons" or previously "subjected to the same sort of adversarial questioning as live, in-person testimony" (citations omitted)); *see also Moon*, 2025 WL 1672885, at *15 (stating that co-defendants' proffer statements were admissible at probation hearing when they were "made against their penal interest" and when much of the same information was "'adduced through the cross-examination of'" another witness (citations omitted)). Furthermore, the record establishes that at least some of the information—notably Defendant's social security number and birth date—was not accurate.

Consequently, we conclude that the admission of Ms. Clay's testimony did not meet minimum due process requirements and should not have been admitted. *See State v.*

9

*Littrell*, No. W2022-01433-CCA-R3-CD, 2023 WL 6548679, at *3 (Tenn. Crim. App. Oct. 9, 2023) (concluding that admission of hearsay evidence violated principles of due process because the trial court failed to make a specific good cause finding). We turn next to the appropriate remedy.

### C. Remedy

The State agrees that the admission of Ms. Clay's testimony was not harmless because it was the only evidence offered to support the revocation but argues that this court should remand the case for a new hearing on the revocation warrant. Defendant asserts that we should reverse the revocation and dismiss the warrant.

As we consider the appropriate remedy in this case, we remain mindful that the trial court cannot revoke a sentence of probation unless a preponderance of the evidence in the record supports a finding that the defendant violated his probation conditions. *See State v. Beard*, 189 S.W.3d 730, 734-35 (Tenn. Crim. App. 2005); *see also* Tenn. Code Ann. § 40-35-311(d)(1); *State v. Dagnan*, 641 S.W.3d 751, 756 (Tenn. 2022) (quoting *Beard*, 189 S.W.3d at 734-35). "On appeal from a trial court's decision revoking a defendant's probation, the standard of review is abuse of discretion with a presumption of reasonableness so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *Dagnan*, 641 S.W.3d at 759.

### 1. Alleged violations

Here, Ms. Clay testified about the allegations contained in the violation affidavit and warrant but acknowledged that she did not personally supervise Defendant, had never met Defendant, and had no independent personal knowledge of the information placed in his file by Ms. Lundy. The State argued that Defendant failed to rebut the allegations, but that argument overlooks the fact that the State must present proof at the hearing establishing the violations by a preponderance of the evidence. *See Dagnan*, 641 S.W.3d at 756; *Beard*, 189 S.W.3d at 734-35; Tenn. Code Ann. § 40-35-311(d)(1). As Judge Greenholtz observed in his dissenting opinion in *Sokolosky*, a case where the only evidence came in the form of testimony from a probation officer without personal knowledge of the defendant's supervision history and the violation warrant itself,

> [U]sing the warrant's own allegations as evidence of a violation collapses the essential distinction between pleading and proof. The warrant serves to charge; the hearing serves to prove. I am not aware of any case in which a violation has been sustained solely on the strength of the warrant itself, and Tennessee Code Annotated section 40-35-311(d)(1) requires more.

*Sokolosky*, 2025 WL 2438438, at *11 (Greenholtz, J., dissenting).

### a. New Charges

The warrant alleged, and Ms. Clay testified, that Defendant violated the terms of his probation by garnering a new citation for driving after his license had been suspended or revoked. However, the State offered no proof from which the trial court could have evaluated the veracity of that allegation such as the record of the disposition of that charge in the general sessions court. Further, the State did not present any evidence in support of the charge itself so that the trial court could make its own determination of whether Defendant had committed the new offense. *State v. Stubblefield*, 953 S.W.2d 223, 225-26 (Tenn. Crim. App. 1997) (observing that "the trial court could not have considered [the defendant's three arrests], without more, as evidence of criminal conduct" (first citing *State v. Miller,* 674 S.W.2d 279, 284 (Tenn. 1984); and then *State v. Newsome,* 798 S.W.2d 542, 543 (Tenn. Crim. App. 1990)). Consequently, the State failed to establish this violation by a preponderance of the evidence.

### b. Failure to Pay Restitution and Costs

The warrant also alleged that Defendant violated the terms of his probation by failing to pay restitution and supervision fees. However, there was not sufficient proof from which the trial court could have determined that (1) Defendant did, in fact, fail to pay and (2) that his failure to do so was willful. *See Bearden v. Georgia*, 461 U.S. 660, 668-69 (1983). In *Bearden*, the Supreme Court held that only the willful failure "to pay the fine or restitution when he has the means to pay" can support the revocation of probation and that, when there is evidence that the defendant lacks the ability to pay "it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available" *Id.* (citations omitted)); *see State v. Dye*, 715 S.W.2d 36, 39-41 (Tenn. 1986) (holding that trial court may revoke probation for failure to pay restitution only when the State establishes that defendant had the ability to pay but willfully failed to do so). Additionally, the State failed to present proof of the total amount of restitution owed and the terms of the payment plan referred to in the violation warrant. Under these circumstances, Defendant's alleged failure to pay either restitution or supervision fees could not have supported the revocation of his probation.

### c. Failure to Maintain Employment

Relatedly, the warrant alleged that Defendant had failed to show proof of employment, but the only evidence came from Ms. Clay's improperly admitted testimony as to an absence of information in the records. Without more, this is insufficient to support this allegation. Therefore, this allegation could not have supported the revocation of Defendant's probation.

11

*d. Failure to Report*

The warrant alleged that Defendant failed to report after November 2015, but the State offered no proof to support the allegation aside from the nearly nine-year-old information contained in the violation warrant itself. *See State v. Rand*, 696 S.W.3d 98, 104-05 (Tenn. Crim. App. 2024) (providing non-exhaustive list of "circumstantial evidence from which a court may infer that a defendant has absconded from supervision" (citations omitted); *see also Sokolosky*, 2025 WL 2438438, at *10 (Greenholtz, J., dissenting) (stating that, to prove a probation violation based on failure to report, the State must "establish when, how, and to whom the probationer was expected to report, together with some basis to conclude that the probationer understood those expectations" and that the testimony of the only witness showed that "she had no personal knowledge of the supervision history, communications, or outreach" and holding that "[a]bsent proof of the reporting obligation and notice, the lack of post-November entries in a file cannot satisfy the State's burden to prove willful avoidance of supervision"). The arrest warrant return, which was included in the technical record, showed that Defendant was arrested in Texas. Without more, however, that fact is insufficient to support a finding of failure to report and, accordingly, the record does not support a finding that Defendant absconded.

Thus, we are faced with insufficient proof because the record contains no substantial evidence of any of the alleged violations. In *State v. Otten*, another case where the State offered only the hearsay testimony of a probation officer who identified himself, as did Ms. Clay, as the "keeper of the records" to support the revocation of the defendant's community corrections placement, this court considered the appropriate remedy for the trial court's erroneous admission of that testimony. *State v. Otten*, 721 S.W.3d 14, 17 (Tenn. Crim. App. 2025). Otten's probation officer was absent from the hearing due to "ongoing medical concerns," which this court deemed good cause for her absence. *Id.* at 20. However, we concluded that the offered testimony was not reliable because the officer who testified "had no independent knowledge of the information contained in Defendant's case file." *Id.* Accordingly, we determined that the trial court erred by admitting the testimony and relying on it to support the revocation of Otten's probation. *Id.* at 20-21. We concluded that because the State presented only inadmissible hearsay "at the revocation hearing to support a violation of Defendant's community corrections sentence," it had "failed to establish that Defendant violated the conditions of his community corrections sentence." *Id.* at 20. Instead of remanding the case, however, the panel reversed the revocation and dismissed the violation warrant. *Id.* at 21. Similarly, as Judge Greenholtz explained in his dissent in *Sokolosky*, because "the defect here is not the absence of an evidentiary finding but the absence of evidence itself," "the only proper remedy is to reverse and vacate the revocation order and dismiss the violation warrant." *Sokolosky*, 2025 WL 2438438, at *11 (Greenholtz, J., dissenting). We are persuaded by this reasoning and, therefore, we reverse the judgment of the trial court revoking Defendant's probation and dismiss the violation warrant.

## II. Contempt

As explained elsewhere in this opinion, the record in this case demonstrates that Defendant's repeated interruptions of the trial court and his failure to respond to the court's orders were compounded by his sometimes inept and inartful attempt to represent himself at the revocation hearing. Several contentious exchanges led to the trial court's holding Defendant in contempt twenty times and imposing twenty consecutive sentences of ten days for each finding of contempt. On appeal, Defendant challenges the sufficiency of the evidence supporting the findings of contempt and the consecutive alignment of the sentences.

The power of the courts of this state to punish contempt is "purely statutory." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008) (citations omitted). As is relevant here, Tennessee Code Annotated section 29-9-102 empowers the trial court to punish as contempt cases of "[t]he willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice" or the "[a]buse of, or unlawful interference with, the process or proceedings of the court." Tenn. Code Ann. § 29-9-102(1), (4). "Although acts constituting contempt cover a wide range, the most familiar forms of contempt are found in acts which hinder, delay, and obstruct the administration of justice." *In re Brown*, 470 S.W.3d 433, 443 (Tenn. Ct. App. 2015) (citations and internal quotation marks omitted). Contempt may be punished by a fine of $50.00 and/or imprisonment of up to ten days per violation. *See* Tenn. Code Ann. § 29-9-103.

### A. Direct v. Indirect Contempt

Contempt is classified as direct contempt based upon acts committed in the presence of the court, which may be punished summarily, or indirect contempt based upon acts not committed in the presence of the court, which may be punished only after the offender has been given notice and an opportunity to respond to the charges. *See State v. Turner*, 914 S.W.2d 951, 955 (Tenn. Crim. App. 1995) (citations omitted); *see also State v. Beeler*, 387 S.W.3d 511, 520 (Tenn. 2012) (emphasizing importance of distinction because different procedural protections apply to each). Notably, "criminal contempt may be adjudicated summarily if the judge certifies that he or she saw or heard the conduct and that it was committed in the presence of the court, or it may be adjudicated by judgment after notice and a hearing." *In re Brown*, 470 S.W.3d at 444-45 (citing *State v. Provencio,* No. E2005-01253-CCA-R3-CD, 2005 WL 3088078, at *2 (Tenn. Crim. App. Nov. 18, 2005)); *see also* Tenn. R. Crim. P. 42(a) ("A judge may summarily punish a person who commits criminal contempt in the judge's presence if the judge certifies that he or she saw or heard the conduct constituting the contempt. The contempt order shall recite the facts, be signed by the judge, and entered in the record."). This case involves direct contempt.

Because "summary punishment" like the kind that occurs in cases of direct contempt represents a departure from traditional principles of due process, "it is reserved for those

circumstances in which it is essential" and "should be used sparingly." *Turner*, 914 S.W.2d at 957 (citations omitted). Thus, "courts exercising summary contempt power must consider, in addition to the facial requirements of Rule 42(a), the nature of the conduct, its effect, if any, on the administration of justice, and the overall purpose of Rule 42(a) proceedings." *Id.* at 958. "The courts' summary contempt authority 'must be viewed in light of its express purpose and function,' which is 'to punish certain conduct when necessary to vindicate the dignity and authority of the court.'" *In re Brown*, 470 S.W.3d at 445 (quoting *Turner*, 914 S.W.2d at 956). "Summary contempt is appropriate when there is a need to act swiftly and firmly to prevent contumacious conduct from disrupting the orderly progress of" the proceedings. *Id.* (quoting *Beeler*, 387 S.W.3d at 520 n.5). Such conduct "include[s] acts committed in the presence of the court that are disrespectful, unreasonable, or contemptuous; use of violent or loud language or noises; or 'turbulent' conduct that disrupts the proceedings." *Id.* at 444 (quoting *Watkins ex rel. Duncan v. Methodist Healthcare Sys.*, W2008-013490-COA-R3-CV, 2009 WL 1328898, at *6 (Tenn. Ct. App. May 13, 2009)).

There are "additional considerations" when "the contemnor is counsel for a litigant." *Id.* When a finding of direct criminal contempt involves counsel, the court must balance between "two indispensable conditions to the fair administration of criminal justice":

> (1) counsel must be protected in the right of an accused to "fearless, vigorous and effective" advocacy, no matter how unpopular the cause in which it is employed; (2) equally so will this Court "protect the processes of orderly trial, which is the supreme object of the lawyer's calling."

*Id.* (quoting *Offutt v. United States,* 348 U.S. 11, 13 (1954)). Further, "the contemnor's conduct 'cannot fairly be considered apart from that of the trial judge." *State v. Green*, 783 S.W.2d 548, 550 (Tenn. 1990) (quoting *Offutt*, 348 U.S. at 13). Because Defendant represented himself, these "additional considerations" attend here.

*B. Grounds for Contempt*

In this case, the trial court's certification for each finding of contempt states:

> [Twenty] consecutive contempt citations, as this defendant, representing himself by his own choice, continued to interrupt this court time after time when repeatedly warned, objecting to this court's rulings and continually interrupting this court when this court was continually trying to explain and rule.

14

This statement could describe willful misbehavior in the presence of the court or interference with the proceedings of the court.  *See* Tenn. Code Ann. § 29-9-102(1), (4).

Although our supreme court has "not defined the exact contours of 'willful misbehavior'" as it is used in the statute, the court has consistently stated that willfulness "entails an *intentional*" action.  *Beeler*, 387 S.W.3d at 523.  "[I]in the context of criminal contempt, willfulness has two elements: (1) intentional conduct; and (2) a culpable state of mind."  *Hill v. Hill*, 682 S.W.3d 184, 211 (Tenn. Ct. App. 2023) (quoting *Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at *31 (Tenn. Ct. App. Oct. 3, 2014)).  In *Beeler*, the supreme court equated "willful" with "'intentional,' as defined by" Tennessee Code Annotated section 39-11-302: "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result."  *Beeler*, 387 S.W.3d at 523 (citing Tenn. Code Ann. § 39-11-302(a)).  The court also observed that the statute applies specifically to "'willful *mis*behavior'—not 'willful behavior.'"  *Id.* at 524.  As the court explained elsewhere, "in criminal law, 'willfully' connotes a culpable state of mind.  In the criminal context, a willful act is one undertaken for a bad purpose."  *Konvalinka*, 249 S.W.3d at 357 (Tenn. 2008) (first citing *Bryan v. United States*, 524 U.S. 184, 191 (1998); and then *State v. Braden*, 867 S.W.2d 750, 761 (Tenn. Crim. App. 1993)).  "Acts of willful disobedience or disrespectful conduct, by their nature, pose the risk of obstructing the administration of justice."  *Turner*, 914 S.W.2d at 958.

"Exceptional circumstances justifying summary contempt 'certainly include acts threatening the judge or disrupting a hearing or obstructing court proceedings, or other unusual situations . . . where instant action is necessary to protect the judicial institution itself."  *In re Brown*, 470 S.W.3d at 446 (quoting *Turner*, 914 S.W.2d at 957).  "Some factors for consideration are 'the reasonably expected reactions of those in the courtroom, the manner in which the remarks are delivered, the delay in the proceedings caused by a disrespectful outburst, and the failure to heed explicit directives of the court.'"  *Id.* (quoting *Turner*, 914 S.W.2d at 958).

*C. Standard of Review*

"A person charged with criminal contempt is presumed innocent, and guilt must be proven beyond a reasonable doubt."  *Beeler*, 387 S.W.3d at 519 (first citing *Black v. Blount*, 938 S.W.2d 394, 399 (Tenn. 1996); and then *Robinson v. Air Draulics Eng'g Co.*, 377 S.W.2d 908, 912 (Tenn. 1964)).  A finding of contempt removes the presumption of innocence and replaces it with the burden of overcoming the presumption of guilt on appeal.  *Id.* (first citing *Black*, 938 S.W.2d at 399; and then *Robinson*, 377 S.W.2d at 912).  We will reverse a finding of contempt only "when the facts in the record, and any inferences that may be drawn therefrom," considered in the light most favorable to the finding of contempt, "are insufficient as a matter of law for a rational trier of fact to find the accused guilty of the crime beyond a reasonable doubt."  *Id.* (first citing *Black*, 938 S.W.2d at 399;

15

and then Tenn. R. App. P. 13(e)); *see also Baker v. State*, 417 S.W.3d 428, 436 (Tenn. 2013) (stating that "an alleged criminal contemnor, like a person charged with a criminal offense, is presumed to be innocent, must be proven guilty beyond a reasonable doubt" (citations omitted)); *State v. Boldus*, No. M2008-01274-CCA-R3-CD, 2009 WL 2567629, at *4 (Tenn. Crim. App. Aug. 18, 2009) (applying general sufficiency analysis to trial court's finding of direct contempt). The trial judge retains discretion to summarily punish direct contempt, and accordingly we review that determination to discern whether the trial court abused its discretion. *In re Brown*, 470 S.W.3d at 448. Consequently, in this appeal, we must determine whether the evidence preponderates against the findings of contempt and, if not, whether the trial court abused its discretion when it decided to summarily punish Defendant for direct criminal contempt. *See id.*

Importantly, each finding of contempt must stand on its own. *See Beeler*, 387 S.W.3d at 523 (stating that reviewing court "must consider whether the facts in the record, and any inferences that may be drawn therefrom, are sufficient for a rational trier of fact to conclude beyond a reasonable doubt that [the contemnor] engaged in 'willful misbehavior'" (citing *Black,* 938 S.W.2d at 399); *Trezevant v. Trezevant*, 568 S.W.3d 595, 625 (Tenn. Ct. App. 2018) (individually analyzing "the trial court's findings on the merits of the 19 counts of criminal contempt"); *see also Rose v. Malone*, No. M2022-01261-COA-R3-CV, 2025 WL 657732, at *12 (Tenn. Ct. App. Feb. 27, 2025) (considering each of twenty-three findings of contempt individually), *perm. app. denied* (Tenn. Aug. 7, 2025).

### D. Trial Court's Contempt Findings

All twenty certifications of contempt in this case contain identical descriptions of Defendant's contemptible conduct; thus, we must examine the transcript of the hearing to evaluate whether sufficient evidence exists for each finding of contempt.

### 2. First Contempt

The trial court's first finding of contempt came early in the proceeding just after Defendant read his motions into the record. As the court began to rule, Defendant "objected," and interrupted four more times. The court told Defendant that he would give him "ten days for every word you say unless you let me rule." When the trial court stated that the delay of more than eight years between issuance and service of the violation warrant was "of no consequence at all," Defendant objected again, and the trial court stated, "That's ten days. I'm giving you ten extra days in prison because you're continuing to talk during my ruling."

Although Defendant seemingly did not raise his voice, threaten the trial court, or use profane or abusive language, he disrespected the court and refused to allow the court to make its ruling, even after he was warned. *See Turner*, 914 S.W.2d at 958 (describing contemptible conduct as "disrespectful," "unreasonable" "clamorous and violent language," "turbulent conduct," and "loud speaking or making any noise in the courtroom

16

or so near thereto as to interfere with the procedure of the court" (citations and internal quotation marks omitted)). Even if the pro se Defendant did not initially understand the proper procedure for making his concerns known to the court, he should have subsided when the trial court attempted to explain the procedure to him. Under these circumstances, the evidence does not preponderate against the trial court's first finding of contempt. Further, the trial court did not err by "exercising its permissive discretionary authority to summarily punish [Defendant] for direct criminal contempt" because immediate action was "necessary to vindicate the dignity and authority of the court.'" *In re Brown*, 470 S.W.3d at 445 (quoting *Turner*, 914 S.W.2d at 956); *id.* at 448 (citing *Watkins,* 2009 WL 1328898, at *5).

### 3. Second and Third Contempt

The second and third findings of contempt came in quick succession, and we will consider them together. After the trial court ruled that the warrant was valid despite the delay in its service on Defendant, Defendant asked the court to rule on his allegation that the violation warrant was invalid because it failed to correctly identify him. Even after the court told Defendant that the purpose of taking his fingerprints was to confirm his identity, Defendant continued to argue that confirmation of his identity in court would not affect the validity of revocation warrant, and the court told Defendant that he was "wrong."

Thereafter, the trial court read the allegations contained in the violation affidavit. Defendant again interrupted to say that "the restitution and those fines had already been discharged," and the court responded, "No, sir. I had not discharged them." Defendant continued to insist that they had "already been discharged" and that he had sent them to "the District Clerk." When Defendant said, "I'mma tell you what I have done," the court responded, "I don't care what you are gonna say. We're gonna have the hearing in just a minute. That's a defense you're gonna make to the hearing. We . . . haven't had the hearing yet." When the trial court tried to explain the process, Defendant interrupted, saying, "Okay. Okay. Let me --." The trial court warned Defendant that if he interrupted the court again, he would be "in contempt of court" and would receive "consecutive jail time." When Defendant began to argue that the trial court had "no jurisdiction." The trial court responded, "That's another ten days." The court admonished Defendant, "Don't say another word." Instead of remaining quiet, Defendant began, "You don't let --," and the trial court again admonished Defendant, "Don't say another word right now. Stop arguing." Again, Defendant did not stand silent but said, "You lacking the jurisdiction, Your Honor." The trial court replied, "Okay. That's 30 days."

In our view, the evidence does not preponderate against the second and third findings of contempt. The trial court had repeatedly warned Defendant not to interrupt, had informed Defendant that he would have an opportunity to present his evidence and argument during the revocation proceeding, and had attempted to explain the procedural posture of the case to Defendant. Defendant's refusal to listen to the trial court's

17

admonishments and his continued arguing hindered the progress of the proceeding and can be classified as willful misbehavior designed to "derogate[] the court's authority." *Black*, 938 S.W.2d at 399. Further, the trial court did not err by "exercising its permissive discretionary authority to summarily punish [Defendant] for direct criminal contempt" because immediate action was "necessary to vindicate the dignity and authority of the court.'" *In re Brown*, 470 S.W.3d at 445 (quoting *Turner*, 914 S.W.2d at 956); *id.* at 448 (citing *Watkins,* 2009 WL 1328898, at *5).

### 4. Contempt Findings Four through Seven

After the trial court found Defendant in contempt for a third time, it reiterated that the allegations in the warrant provided the "probable cause to issue the warrant." Defendant stated, "The warrant has no legal effect." The court replied, "You are wrong," and attempted to begin the hearing, but Defendant interrupted, stating, "I have a passport. So what -- so what you're saying is not true, Your Honor." The trial court told Defendant, correctly, that possession of a passport was not a defense to the allegations in the warrant, and Defendant began to argue again. The trial court admonished Defendant to "keep your mouth shut at this time, and if you want to appeal my ruling, you can." Defendant told the trial court to "[g]o ahead," and the court said, "I don't need your permission to go ahead." The court again admonished Defendant, "Do not say another word unless I ask you a question. And if you do it's ten days per word consecutive to a six-year sentence."

At that point, the trial court provided Defendant an opportunity to make an opening statement, but Defendant declined. The hearing began with the State's calling Ms. Clay as a witness. Defendant and the trial court had a heated exchange at the beginning of Defendant's cross-examination of Ms. Clay when Defendant asked Ms. Clay to state her name for the record, and the trial court said that it had already been done. Defendant immediately began to ask Ms. Clay if she knew Ms. Lundy, but the trial court told him to "Stop talking when I'm talking." Defendant told the trial court to "[g]o ahead," and the trial court said, "Please, you don't need to tell me to go ahead. I'm gonna go ahead whether you tell me to or not, sir."

Defendant resumed his cross-examination of Ms. Clay, and when Ms. Clay stated that Ms. Lundy was no longer employed as a probation officer and was not present in court, Defendant moved to dismiss "[u]nder the Sixth Amendment" on grounds that Ms. Clay did not prepare the violation affidavit. The trial court overruled the motion. Defendant argued that Ms. Lundy's presence was necessary, but the trial court stated it had "already ruled" and told Defendant to "ask another question." Defendant argued that he had "a right to face my accuser" and "to cross-examine the accuser." The trial court pointed out the prosecutor and told Defendant that the prosecutor was his accuser, but Defendant argued that "he can't be." At that point, the trial court ordered Defendant to "[s]top talking," and Defendant twice repeated, "He can't be." The trial court found Defendant in contempt a fourth time.

18

Defendant again repeated, "But he can't be --," and the trial court found him in contempt a fifth time. The court admonished Defendant, "Sir, you need to understand this. You're -- you don't know what you're talking --," and Defendant interrupted, "I'mma appeal this, Your Honor." The trial court found Defendant in contempt a sixth time and implored Defendant, "Don't do that to yourself." Instead of heeding the warning, Defendant replied, "Intellectual property rights go to the house of Sullivan." The Court found Defendant in contempt a seventh time, and Defendant insisted, "I'm not gonna do them years."

In our view, the record does not preponderate against the fourth through seventh findings of contempt. Instead of zealously advocating his position, Defendant was arguing with the trial court after the trial court had ruled definitively. Frustration with the trial court's inaccurate ruling does not excuse his behavior. Importantly, we emphasize that the sixth finding of contempt was appropriate based not on Defendant's stated intent to appeal the ruling of the trial court, which was permissible, but on "the manner in which the remarks [we]re delivered" and Defendant's "failure to heed explicit directives of the court.'" *In re Brown*, 470 S.W.3d at 446 (quoting *Turner*, 914 S.W.2d at 958). Defendant's tone was one of defiance to the court, when he stated, "I'm not gonna do them years." Further, the trial court did not err by "exercising its permissive discretionary authority to summarily punish [Defendant] for direct criminal contempt." *Id.* at 448 (citing *Watkins*, 2009 WL 1328898, at *5).

5. Contempt Findings Eight through Thirteen

Following the seventh contempt finding, the trial court again attempted to explain the reasoning behind its denial of his motion to dismiss and told Defendant that what he was "saying is wrong." Defendant replied, "No," and then continued to attempt to assert his position. Thereafter, the court and Defendant began to speak over one another. The trial court told Defendant to "stop talking," and when Defendant did not, the trial court found him in contempt an eighth time.

Defendant then said, "It is not true, Your Honor--," and the trial court found him in contempt a ninth time. Defendant said, "She should be here to see --," and the trial court found him in contempt a tenth time. Defendant then said, "This injury --," and the trial court said, "-- you won't shut up." When Defendant again referenced "injuries," the trial court found him in contempt an eleventh time. Defendant then said, "It's injuries." The trial court found him in contempt a twelfth time. At that point, Defendant said, "And you'll be held liable." The trial court stated, "That's 130 days of prison he's gonna do just for these contempt charges."

In our view, the record does not preponderate against these findings of contempt. Some of the findings of contempt arguably related to Defendant's attempt to explain his position to the trial court, but in pressing his side, Defendant failed to heed the trial court's

19

warning to stay silent during the court's ruling. Although we are of the opinion that the trial court should not have told Defendant to "shut up," particularly given that Defendant was acting as counsel in the litigation, it does not change our analysis. With these considerations in mind, we affirm those findings. Moreover, the trial court did not err by "exercising its permissive discretionary authority to summarily punish [Defendant] for direct criminal contempt." *In re Brown*, 470 S.W.3d at 448 (citing *Watkins,* 2009 WL 1328898, at *5).

The eleventh, twelfth, and thirteenth findings represent obstinate behavior by Defendant. At those points, Defendant was just arguing, and his comment that the trial court would be "held liable," in particular, was contemptuous. Accordingly, we affirm those findings of contempt and the trial court's exercise of "its permissive discretionary authority to summarily punish [Defendant] for direct criminal contempt." *Id.* at 448 (citing *Watkins,* 2009 WL 1328898, at *5).

### 6. Contempt Findings Fourteen through Sixteen

After the thirteenth finding of contempt, the trial court stated, "Now, I'm explaining to you this, that the person who signs an affidavit is not required to be here --," and Defendant said, "I have that right." The trial court then found him in contempt for a fourteenth time. The court then explained, "But you need to understand that they're also -- it's not hearsay because the government records exception applies. You don't understand the rules of evidence." When Defendant said that he did understand the rules of evidence, the trial court found him in contempt a fifteenth time. When Defendant said, "I understand my constitutional rights," the trial court found him in contempt a sixteen time.

In our view, the evidence preponderates against these findings of contempt. As to the fourteenth finding, Defendant stated simply that he had the right to have the probation officer present. He did not use abusive language or denigrate the authority of the court. The statement does not appear to have been made for a bad purpose but to assert his constitutional right. As to the fifteenth finding, Defendant's statement that he did understand the rules of evidence was given in direct response to the trial court's statement that he did not understand the rules and was not, in our opinion, willful misbehavior.[5] Similarly, Defendant's statement that he understood his constitutional rights was not, in our opinion, contemptible behavior. The trial court was undoubtedly frustrated with Defendant's inartful attempts to advocate his positions, but those attempts did not rise to the level of contempt. Accordingly, we reverse the fourteenth, fifteenth, and sixteenth findings of contempt.

---

[5] If the trial court truly believed that Defendant did not understand the rules of evidence, he could have inquired again into Defendant's ability to represent himself at trial. *See Herrod*, 754 S.W.2d at 630 (recommending that trial judges use a "litany of questions" that includes an inquiry into whether the defendant knows and understands the rules of evidence).

20

## 7. Contempt Findings Seventeen through Twenty

At the conclusion of the testimony, the State began its closing argument. When the prosecutor stated that Defendant had pending "felony matters" in Texas, Defendant objected. The trial court told Defendant to stop, adding, "You can't object during closing arguments." When Defendant asked, "What --," the trial court again told him to "[s]top talking now so that I can rule." Defendant said, "Go ahead. Go ahead." The trial court then stated, "Now, sir, I should give you another 20 days in prison for saying oh, oh, go ahead, but I'm not going to, but next time I will. You do not control this courtroom." The trial court explained that Defendant would be given an opportunity to "give an argument" in response to the prosecutor's argument but would not be permitted "to object and refuse to let him be heard in court." The court further warned Defendant that he would be in contempt if he objected again during the prosecutor's argument. Defendant replied that he had "the right to object, Your Honor, for the record" and argued that the trial court was "trying to deny me my proof . . . as to the record." The trial court again attempted to explain that the prosecutor was giving an argument, that the argument was not proof, and that Defendant would be given an opportunity to respond. Instead of subsiding, Defendant replied, "And I have the right to object." The trial court found Defendant in contempt a seventeenth time and imposed another ten-day sentence for "a total of 170 consecutive days, day for day in prison consecutive to any time you get on this if your probation is violated."

After the trial court finished its statement, Defendant said, "And I'm asking --," and the trial court replied, "Stop. Okay. That's another -- that's 180 days in prison consecutive. Why are you giving yourself this jail time? I don't understand." Defendant stated, "You gone be held liable," and the trial court found him in contempt a nineteenth time, adding, "And I'll give you two or three years if you want, but there's no parole on that and you don't get good time. You've got to do every single day. So please keep your mouth shut until it's time for you to [argue]."

Thereafter, the State resumed its closing argument, during which Defendant objected once again but was not cited for contempt, and Defendant gave his closing argument. When the trial court ruled that Defendant was the person named in the warrant and that there had been no proof presented to show that Defendant had abided by the terms of his probation, Defendant objected. The trial court told Defendant that he could not object to the court's ruling, and Defendant said that he would appeal the ruling. From there, the conversation devolved rapidly:

> THE COURT: So?
> THE DEFENDANT: And you will be held liable.
> THE COURT: So?
> THE DEFENDANT: That --

THE COURT: That's fine, sir. I don't mind that at all because my rulings are correct --

THE DEFENDANT: No, they're not.

THE COURT: -- and I don't mind that at all.

THE DEFENDANT: No, they're not.

THE COURT: And so let me just say this. We're ending --

THE DEFENDANT: According to the rules of judicial --

THE COURT: -- we're ending now but I need to ask you a question, and please, you need to understand, if you keep interrupting me, I'm still going to give you more days in prison consecutive to this six years. And when you get that notice from the parole board that you're up for parole, they're gonna say no, he's got to do another couple hundred days. So you need to understand, sir, that you have to follow court rules. Now with that --

THE DEFENDANT: I will get paid day for day.

THE COURT: Okay. That's 200 days. That's an extra ten days contempt. That's 200 days consecutive to the six years. Okay. . . .

In our view, the evidence does not preponderate against the seventeenth through twentieth findings of contempt. The trial court clearly explained to Defendant that he would be given an opportunity to rebut the State's argument and warned him to refrain from objecting, but Defendant continued to object. Further, despite that the trial court had repeatedly told Defendant that he could not object and interrupt the court's ruling, Defendant continued to do so. Defendant's conduct became increasingly disrespectful and could be seen to "embarrass[], hinder[], or obstruct[] [the] court in its administration of justice or [to] derogate[] the court's authority or dignity." *Black*, 938 S.W.2d at 399. Further, the trial court did not err by choosing to summarily punish Defendant for direct criminal contempt.

In summary, we conclude that the evidence preponderates against the fourteenth, fifteenth, and sixteenth findings of contempt. As a result, those findings are reversed and dismissed. The evidence does not preponderate against the first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, seventeenth, eighteenth, nineteenth, and twentieth findings of contempt. As a result, those findings are affirmed.

*E. Sentencing*

Defendant also challenges the trial court's decision to impose the maximum sentence of ten days for each finding of contempt and to align each of the ten-day sentences for contempt consecutively.

Our supreme court "has previously observed that 'criminal contempt is generally regarded as a crime" and that, "[b]ecause it is punishable by confinement of less than one year, we consider it a misdemeanor for sentencing purposes" and "therefore look to the Tennessee Criminal Sentencing Reform Act of 1989 for guidance." *In re Sneed*, 302 S.W.3d 825, 828 (Tenn. 2010) (citations omitted). *But see Baker*, 417 S.W.3d at 438 ("Despite imprecise language in prior Tennessee appellate decisions, a person found in contempt pursuant to Tennessee Code Annotated section 29-9-102 has not been 'convicted' of a criminal offense for purposes of the Post-Conviction Procedure Act."). Code section 40-35-302 governs misdemeanor sentencing and affords the trial court considerable flexibility in setting the length and manner of service of the misdemeanor sentence. *See* Tenn. Code Ann. § 40-35-302. When imposing a sentence for contempt, the trial court is not required to set a percentage of the sentence that must be served as in the typical misdemeanor case, and the condemner sentenced to incarceration is not entitled to earn good conduct credits. *See State v. Wood*, 91 S.W.3d 769, 776 (Tenn. Ct. App. 2002).

Although our supreme court has not yet applied the standard of review first promulgated in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012)—abuse of discretion coupled with a presumption of reasonableness—to misdemeanor sentencing decisions, it has stated, "The abuse of discretion standard, accompanied by a presumption of reasonableness, is the appropriate standard of appellate review for all sentencing decisions." *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013). Additionally, both this court and the court of appeals have utilized the *Bise* standard when examining contempt sentences. *See, e.g.*, *State v. Havens*, No. M2023-01601-CCA-R3-CD, 2025 WL 3719698, at *9 (Tenn. Crim. App. Dec. 23, 2025) (citing *State v. Hite*, No. E2023-00563-CCA-R3-CD, 2024 WL 3913193, at *4 & n.2 (Tenn. Crim. App. Aug. 23, 2024) (collecting cases)); *In re A.J.*, No. M2014-02287-COA-R3-JV, 2015 WL 6438671, at *4 (Tenn. Ct. App. Oct. 22, 2015) ("The standard we apply in reviewing sentencing decisions, including the determination to impose consecutive sentences, is abuse of discretion, accompanied by a presumption of reasonableness." (quoting *In re Anna L.J.*, No. M2013-00561-COA-R3-JV, 2014 WL 1168914, *5 (Tenn. Ct. App. Mar. 20, 2014)). Consequently, we review the sentence imposed in this case for abuse of discretion coupled with a presumption of reasonableness.

The maximum sentence of ten days has been deemed appropriate "upon a single instance of criminal contempt." *In re Sneed*, 302 S.W.3d at 828 (first citing *Frye v. Frye*, 80 S.W.3d 15, 17, 19 (Tenn. Ct. App. 2002); and then *State v. Ramos*, No. M2007-01766-CCA-R3-CD, 2009 WL 890877, at *8 (Tenn. Crim. App. Apr. 2, 2009)). When imposing a sentence for criminal contempt, the trial court may consider "the extent of the willful and

deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future." *Wood*, 91 S.W.3d at 776 (quoting *United States v. United Mine Workers of America,* 330 U.S. 258, 303 (1947)).

Code section 40-35-115 permits the imposition of consecutive sentences when "[t]he defendant is sentenced for criminal contempt." Tenn. Code Ann. § 40-35-115(b)(7). Importantly, "[t]here is a presumption in favor of concurrent sentencing for convictions of criminal contempt," *Trezevant*, 568 S.W.3d at 640 (Tenn. Ct. App. 2018), and "not every contemptuous act, or combination of contemptuous acts, justifies the imposition of a maximum sentence, particularly when consecutive sentencing is in play," *Simpkins v. Simpkins*, 374 S.W.3d 413, 422 (Tenn. Ct. App. 2012). "Although statutory criteria may support the imposition of consecutive sentences, the overall length of the sentence must be 'justly deserved in relation to the seriousness of the offense[s],' and 'no greater than that deserved' under the circumstances." *In re Sneed*, 302 S.W.3d at 828-29 (first citing Tenn. Code Ann. § 40-35-102(1)-(2); and then *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999)); *see Wood*, 91 S.W.3d at 776 (stating that the sentence imposed for contempt "must 'be the least severe measure necessary to achieve the purpose for which the sentence is imposed'"). This is a particularly important consideration given that a defendant sentenced for contempt must serve the entirety of the sentence undiminished by sentence reduction credits.

Here, the trial court made no findings before imposing the maximum sentence of ten days for each finding of contempt. Additionally, the trial court made no finding that aligning each of the sentences consecutively was "justly deserved in relation to the seriousness of" Defendant's conduct or that the total sentence of more than six months in jail was "no greater than that deserved" based on the record.

We have already concluded that the record supports only seventeen of the twenty findings of contempt, and, accordingly, Defendant's sentence would automatically be reduced from 200 days to 170 days. In our view, however, the record does not establish that a sentence of 170 days' incarceration is "justly deserved" related to Defendant's conduct, which consisted primarily of interrupting the court, or that such a sentence is "no greater than that deserved" under these circumstances. When "we determine that a sentence is excessive, it is incumbent upon this court to reduce or otherwise modify an excessive sentence for contempt." *Simpkins*, 374 S.W.3d at 422 (citations omitted).

The record establishes that Defendant's contemptible conduct occurred in six distinct episodes as we have described. In our view, the trial court did not abuse its discretion by imposing the maximum sentence for each instance of contempt. It is our further view, however, that because the individual instances of contempt within each episode were closely related, the sentences within each episode should be aligned concurrently with each other as follows: (1) first finding is ten days; (2) findings two and

three is ten days; (3) four through seven is ten days; (4) eight through ten is ten days; (5) eleven through thirteen is ten days; and (6) seventeen through twenty is ten days. We conclude that the total sentences for each episode should be served consecutively for a total effective sentence of 60 days to serve. *See In re Sneed*, 302 S.W.3d at 829 (ordering sentence of 500 days for fifty findings of contempt to be served only partially consecutively for a total sentence of 150 days and suspending all but 50 days); *Trezevant*, 568 S.W.3d at 638, 641 (affirming sentence of fifty-five to be served as 20 days' incarceration on consecutive weekends for eighteen findings of contempt); *Simpkins*, 374 S.W.3d 426 (holding that 140 days' incarceration for fourteen findings of contempt was excessive and reducing the individual sentences and ordering partially consecutive sentence for a total sentence forty-nine days to serve); *see also Metro. Gov't of Nashville & Davidson Cnty. v. Jones*, No. M2020-00248-COA-R3-CV, 2021 WL 1590236, at *11 (Tenn. Ct. App. Apr. 23, 2021) (affirming 180-day sentence for contempt when the trial court "suspend[ed] all but four days of the total sentence" thereby "provid[ing] for less severe means of punishment and recogniz[ing] that the sentence 'should be no greater than that deserved'" (citing Tenn. Code Ann. §§ 40-35-103(2), (4)-(5)).

## Conclusion

Because the trial court erred by admitting testimonial hearsay without making the appropriate findings and because no other evidence supported the allegations that Defendant violated his probation, we reverse the revocation of his probation and dismiss the case. Regarding the twenty findings of contempt and affiliated consecutive sentencing decision, we conclude that the evidence preponderates against three of the findings of contempt and reverse and dismiss those findings. We also conclude that the sentence should be modified to 60 days to serve. Accordingly, the judgment of the trial court is affirmed as modified in part and reversed and dismissed in part.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

25